# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**BRENDEN KING**                                                    **PLAINTIFF**

**v.**                           **Case No. 3:19-cv-00207-KGB**

**CITY OF MARION, ARKANSAS, and**
**FRANK FOGLEMAN, Mayor of City**
**of Marion, Arkansas**                                             **DEFENDANTS**

## ORDER DENYING PRELIMINARY INJUNCTION

Plaintiff Brenden King filed a petition for declaratory and injunctive relief against defendants City of Marion, Arkansas ("Marion"), and Frank Fogleman, Mayor of City of Marion, Arkansas, in his official capacity only (collectively, "defendants") (Dkt. No. 1). Pending before the Court are Mr. King's emergency motion for temporary restraining order, motion for emergency temporary restraining order without notifying defendants, and motion for waiver of surety bond (Dkt. Nos. 2, 4, 5). Mr. King seeks injunctive relief against defendants, challenging Marion Municipal Ordinance 124 ("Ordinance 124"), as amended by Marion Municipal Ordinance 585 ("Ordinance 585"), under the First, Fifth, and Fourteenth Amendments to the United States Constitution. Marion and Mr. Fogleman responded in opposition to the motions (Dkt. No. 14).

The Court conducted a hearing on Mr. King's motions (Dkt. No. 19). At the hearing, Mr. King conceded that Marion and Mr. Fogleman have the right to regulate short-term rentals like the bedroom in his home offered for rent on Airbnb. Mr. King clarified that he challenges the manner in which Marion and Mr. Fogleman purportedly singled out one racial demographic to regulate and challenges the application of the ordinances to a permitted attached guesthouse on his property, too. After the hearing, Marion and Mr. Fogleman filed a supplemental brief in opposition (Dkt. No. 22). For the reasons discussed below, and on the record currently before it, the Court denies

Mr. King's motions for temporary restraining order and/or preliminary injunction and denies as moot his motion for waiver of surety bond (Dkt. Nos. 2, 4, 5).

## I. Procedural Posture

On July 22, 2019, Mr. King filed his petition for declaratory and injunctive relief, emergency motion for temporary restraining order, an affidavit in support of his motion, motion for emergency temporary restraining order without notifying defendants, and motion for waiver of surety bond (Dkt. Nos. 1–5).

On August 12, 2019, the Court entered an Order declining to grant Mr. King's motion for temporary restraining order without notifying defendants (Dkt. No. 10, at 2). The Court further stated that it would consider the merits of Mr. King's motions for temporary restraining order and/or preliminary injunction after defendants Marion and Mr. Fogleman had the opportunity to respond (*Id.*). The Court then held an evidentiary hearing on Mr. King's request. For the following reasons, the Court denies Mr. King's motions for temporary restraining order and/or preliminary injunction (Dkt. Nos. 2, 4).

## II. Findings Of Fact

Mr. King is a resident of Crittenden County, Arkansas, and lives with his wife in Marion, Arkansas (Dkt. No. 3, ¶ 1). Mr. King and his wife are of Asian descent (*Id.*, ¶ 7). Mr. Fogleman is the mayor of Marion (*Id.*, ¶ 5). Mr. King contends that Marion is a legally incorporated town under the Arkansas Constitution and has a mayor-council form of government (*Id.*, ¶ 4).

In this action, Mr. King seeks to enjoin defendants from enforcing the provisions of Ordinances 124 and 585 relating to the operation of short-term rentals in R-1 single-family residential districts (*Id.*, ¶¶ 1, 3, 24). Mr. King argues that Ordinance 124, as amended by Ordinance 585, is "[a]rbitrary and [c]apricious and unconstitutionally vague." (*Id.*, ¶ 3). Mr. King

also contends that defendants "have shown through deed and word that their sole goal of the new Ordinance is not to update the City code to prevent Airbnb, but rather it's to remove the only persons of Asian ethnicity from the neighborhood." (*Id.*, ¶ 18).

### A. Mr. King's Testimony

Mr. King owns a home in the River Trace Drive neighborhood of Marion, which is zoned for, and occupied by, single-family dwellings. He purchased the home in the fall of 2018. He testified that, prior to purchasing the home, he did some due diligence to determine whether he could operate an Airbnb out of the home. He maintains that he called Marion and asked the realtor to reach out to people. Mr. King believes the realtor spoke with a Marion City Councilman, who confirmed operating an Airbnb was allowed.[1] Mr. King testified that, on February 28, 2019, he received a cease-and-desist notice that referenced Ordinance 124.[2] At the time, Mr. King was operating an Airbnb out of his house.

Mr. King testified that Airbnb was the only social media platform he used to offer his home as a short-term rental. Although he offered the entire home as a short-term rental on Airbnb, no one ever rented the entire home. Mr. King did rent out a bedroom in his home and also rented out a permitted attached guest house that has two bedrooms and one and a half bathrooms. Mr. King did not provide meals to anyone renting the bedroom in the home or the attached guest house. None of the individuals who rented from Mr. King were related to him as a blood relative, relative by marriage, or anything such as that. Mr. King allowed individuals to rent the bedroom in his home and the attached guest house while he was at and away from the home. He advertised and

---

[1] Plaintiff's Exhibit 13 admitted at the hearing is a screenshot of a text message between Mr. King and his realtor.
[2] Defendants' Exhibit 4 admitted at the hearing is a copy of the cease-and-desist letter, dated February 25, 2019, that Mr. King received on February 28, 2019.

provided renters of the bedroom in his home with access to the bedroom, living room, and backyard. When he received the letter, Mr. King stopped operating his home as a short-term rental and testified that, as of the date of the hearing, he had not again operated it as a short-term rental.

Mr. King testified that, after he stopped operating as an Airbnb, he began living as roommates with three people. These are the individuals about whom he alleges that, if Ordinance 124 is enforced, he would have to evict without legal notice (Dkt. No. 3, ¶ 21). These individuals had been roommates for approximately five to six months at the time of the hearing. Each has a separate room in the house, with access to the whole property, and each pays Mr. King a monthly rent for the opportunity to stay in the house. Mr. King testified that they have a signed contract. These roommates are not related to Mr. King. Mr. King indicated that one of the three roommates discovered the rental directly through the Airbnb website; that the second roommate had previously stayed at Mr. King's Airbnb and heard about the rental through Mr. King; and that the second roommate brought the third roommate. Mr. King does not consider the arrangements with the three roommates to be through an Airbnb operation because, in his opinion, Airbnb is for short-term rentals.

At the time of the hearing, Mr. King was not charged with any criminal violations of Marion zoning ordinances, according to defendants.

Mr. King testified that, at the time of the hearing, his home was currently for sale. His roommates were aware that the home was for sale. Mr. King first listed his home for sale with a flat-fee broker sometime between the end of May and the beginning of July 2019. He testified about the negotiation and payment of commissions. Approximately two to three weeks prior to the hearing, Mr. King withdrew his home from the flat-fee broker service for reasons related to the listing. At the time of the hearing, Mr. King offered his home for sale by owner by running a

Facebook advertisement targeted to a certain demographic, updating Zillow to show the home was for sale, and sending a mass email to local relators with a flier Mr. King created. At the time of the hearing, Mr. King had received one offer to buy the home, and he responded with a counteroffer. He had not heard back with respect to the counteroffer at the time of the hearing.

Mr. King testified that his intent was not necessarily to sell the home. Instead, his intent was to have the home operate as an income generating property whether the income is derived through selling or renting the home. Mr. King has considered moving out of the home and renting out the entire home.

Mr. King was asked about communications with his former lawyer, who advised that the facts did not appear in Mr. King's favor with respect to his dispute with Marion. That lawyer had advised moving out of the house and converting to a traditional rental whereby Mr. King would rent out the entire house.

In support of his claims, Mr. King alleges that defendants have "used a number of tactics to attempt to remove [him] from the River Trace Neighborhood in Marion." (*Id.*, ¶ 6). Mr. King also asserts that Marion Code Enforcement made statements that were false or misleading, informing him that his home was not zoned for an accessory dwelling unit or guest house but instead "was permitted as detached office building." (*Id.*, ¶ 7).

Mr. King maintains that, after Marion Code Enforcement cited him for being in violation of Ordinance 124, he requested a copy of the applicable code section. Mr. King claims that Marion employees "couldn't find it and misdirected him to a large binder of codes but not containing the one in question." (*Id.*) Mr. King maintains that Marion Code Enforcement eventually provided five pages of a 50-page document regarding the code provision and became hostile at his request

(*Id.*).[3]  Mr. King alleges that, during these exchanges, Marion employees referred to him as "you people," told him that he could "null and void his home purchase despite it being 6 months ago and move out of the city," and claimed that he was not "allowed to move in without permission." (*Id.*).  Mr. King testified consistently at the hearing.

Mr. King testified that Jerry Kelley, Marion Code Enforcement Officer, asked him whether he was aware that what he was doing was illegal and against Ordinance 124.  According to Mr. King, Mr. Kelley represented that Marion would charge Mr. King in a criminal complaint.  Mr. King contends that Marion Code Enforcement "would call him less than 24 hours of serving him a Cease and Desist telling him that the City was ready to serve him with Criminal Charges and to appear at certain time or date . . . ." (*Id.*).  Mr. King maintains that he made arrangements with his then-attorney for these meetings, only to have Marion employees cancel these meetings at the last minute (*Id.*).  Mr. King offered consistent testimony at the hearing.

Mr. King acknowledges that, when he raised with Mr. Kelley why he was the only Airbnb host in Marion to receive a cease-and-desist letter, Mr. Kelley generated and served a cease-and-desist letter on another Airbnb host in a neighborhood zoned R-1 in Marion.  Despite this, Mr. King claims that two other Airbnb hosts operating in Marion have not received a cease-and-desist letter.[4]

---

[3]  Plaintiff's Exhibit 1 admitted at the hearing is the document Mr. King contends he received from Marion in response to his request.

[4]  Plaintiff's Exhibit 10 admitted at the hearing is a screen shot taken by Mr. King of an Airbnb posting of another Airbnb host that Mr. King contends demonstrates, based on the dates of the host and guest reviews, that the host was operating during June, July, and August 2019. Plaintiff's Exhibit 6 admitted at the hearing is another screen shot taken by Mr. King of an Airbnb posting of another host that Mr. King contends demonstrates dates of operation based on host and guest reviews.

Mr. King claims that, while Marion employees delayed in providing the code provision, Marion "was actively holding [a] public hearing on Mr. King's Airbnb but refused to notify him." (*Id.*, ¶ 8). He claims Marion notified his neighbors of the upcoming public hearings, however (*Id.*).

Mr. King cites Facebook posts purportedly made by a Deputy County Clerk regarding a local judge and others, addressing the Airbnb ordinance and referring to Mr. King "as a criminal . . . ." (*Id.*, ¶ 9). Mr. King maintains that the Deputy County Clerk who posted and the judge to whom she refers in her post live in the same neighborhood where he lives (*Id.*).

Mr. King maintains that the Marion City Council passed an ordinance update and that he began attending the next several Marion City Council meetings (*Id.*, ¶¶ 10–11). Mr. King asserts that, at these meetings, "neighbors routinely showed up [and] attacked [his] character," making claims unrelated to Airbnb and instead "accusing him of evading taxes, being a drug dealer, [and] destroying the neighborhood." (*Id.*, ¶ 12). Mr. King alleges that one of these neighbors "seemed to have no idea what Airbnb was, but still loudly proclaimed" that he did not want Mr. King in the neighborhood (*Id.*). Mr. King claims that the Marion City Council began to give Mr. King's neighbors legal advice about acts to take against him, like filing police reports (*Id.*, ¶ 15).

Mr. King alleges that the Marion City Council "routinely dismissed other Airbnb hosts who were White making special exceptions for them." (*Id.*, ¶ 13). He claims that Caucasian Airbnb hosts in Marion did not receive threats from Marion regarding enforcement (*Id.*). Mr. King claims that, even after he "shut down his Airbnb as a good faith gesture to the City until" the issue could be resolved, Marion City Council members still accused Mr. King of hosting Airbnb (*Id.*).

At these meetings, Mr. King presented photographs and video footage of alleged ordinance violations that he claims should have prompted Marion Code Enforcement to act.[5] Mr. King testified that, when he followed up, Marion Code Enforcement officials had taken no action with respect to these alleged ordinance violations, yet in response to Mr. King's alleged violation, Marion Code Enforcement moved quickly to generate criminal charges. Mr. King testified that the individuals responsible for the alleged ordinance violations that he reported are not Asian and that comments made by Marion officials during these events prompted him to question whether his race or ethnicity contributed to the acts about which he complains.

For relief, Mr. King seeks damages resulting from Marion and Mr. Fogleman's conduct in the amount of "not less than $48,000 as well as other actual and consequential damages," which Mr. King contends he expects to lose resulting from the loss of Airbnb income over the next five years (*Id.*, ¶ 3). Mr. King also contends that, by threatening criminal violations, Mr. King and his wife's professional careers, livelihoods, and abilities to earn an income have been and will continue to be impacted (*Id.*, ¶¶ 19, 22).

### B. Edward Cain's Testimony

Edward Cain is a resident of Marion, Arkansas, and, since September 2008, has worked as part-time City Planner for Marion (Dkt. No. 14-1, ¶¶ 1–2). He is not a member of the Marion City Council, although he is consulted on matters involving Marion and is the secretary of the Marion Planning Commission. His secretarial duties include coordinating Marion Planning Commission meeting agendas; preparing and distributing information packets to the Planning Commission

---

[5] The photographs and still shots from dash-cam and security-camera footage of other alleged code violations were admitted as Plaintiff's Exhibit 7 at the hearing. Plaintiff's Exhibit 17 admitted at the hearing is a copy of Ordinance 124, the zoning ordinance allegedly violated as evidenced by Exhibit 7.

members prior to meetings; taking, preparing, and maintaining minutes of the Planning Commission meetings; and providing guidance and assistance to the Planning Commission.[6]

Mr. Cain is familiar with Marion zoning ordinances. Ordinance 124 was adopted on March 26, 1974 (*Id.*, ¶ 3). Ordinance 585 was passed by the Marion City Council on June 25, 2019 (*Id.*). Mr. Cain believes that Ordinance 124 prohibited short-term rentals like Airbnb based on the definition of "home occupation."[7] Mr. Cain was unable to point to a distinction in Ordinance 124 between long-term and short-term rentals. Mr. Cain was questioned about the definition of "family" in Ordinance 124.

Mr. Cain drafted Ordinance 585 (*Id.*, ¶ 4).[8] He spoke to the Marion City Attorney while doing so. According to Mr. Cain, he did not draft Ordinance 585 to be discriminatory against any citizen based on race or ethnicity. Mr. Cain does not believe that Mr. King has been targeted because of his race or ethnicity.

Mr. Cain does not have knowledge of Arkansas making a determination regarding whether Airbnb constitutes a commercial use of property. Mr. Cain prepared the minutes for the April 2, 2019, Marion Planning Commission meeting.[9] Mr. Cain recalls no comment made by any individual at a Marion Planning Commission meeting that he would regard as racially or ethnically discriminatory.

Mr. Cain researched Airbnb prior to the Marion Planning Commission taking up the issue. He conducted online research. Of the 47 or 48 articles referenced on a website, Mr. Cain read only

---

[6] The Marion current zoning map, revised August 2016, was admitted as Defendants' Exhibit 3.

[7] Plaintiff's Exhibit 17 admitted at the hearing is the version of Ordinance 124 before it was amended by Ordinance 585.

[8] Marion Ordinance 585 was admitted at the hearing as Defendants' Exhibit 2.

[9] The April 2, 2019, Marion planning commission minutes were admitted as Defendants' Exhibit 6.

one of those articles.  He read a white paper prepared by a member of the American Planning Association that was not related strictly to Arkansas.  The white paper examined positive and negative impacts of Airbnb.  Mr. Cain submitted an affidavit to this Court in which he admittedly listed only the negative impacts of Airbnb (*Id.*).  Mr. Cain does not recall presenting to the Marion Planning Commission any information from the white paper.

In his affidavit to the Court, Mr. Cain cites loss of tax revenue as a negative aspect of Airbnb (*Id.*).  He testified that Marion has a local sales tax as well as an advertising and promotion tax on hotels, motels, and eating establishments.  The white paper Mr. Cain reviewed discussed this, implicating that when operating an Airbnb the normal hotel tax is not paid.  Mr. Cain did not consult the Airbnb website regarding the payment of taxes.  Mr. King represented that Airbnb remits a percentage of taxes to Arkansas, but Mr. Cain was unable to confirm or deny that representation or the details of the taxes remitted by Airbnb to Arkansas or Marion.

Mr. Cain offered in his affidavit to the Court that short-term home rentals result in increased traffic and waste with more people in the home and generally create a commercial-like atmosphere in a zoning district designated as residential (*Id.*).  On this point, Mr. Cain relied on the white paper and comments from neighbors in residential districts.  Marion does not have traffic counters and does not have plans to purchase any to Mr. Cain's knowledge.  Mr. Cain testified that personal observation may be used to measure increased traffic.  Mr. Cain testified that he understood ordinances in Marion to require one and a half spaces of off-street parking per residence; to restrict parking on the street after certain times of day; and to bill monthly by the residence for waste hauling, not by the tonnage or can.

Ordinance 585 also bars mechanical equipment that creates noise, dust, odor, or electrical disturbance beyond the property where the home is occupied.  Mr. Cain again testified that

personal observation may be used to measure this, including complaints by neighbors due to an alleged increase.

Prior to engaging in his online research, Mr. Cain had no experience with Airbnb. He had never stayed at an Airbnb. In conducting research, Mr. Cain did access the Airbnb website and looked at the main page of several listings in Marion, including the 285 River Trace Drive listing. He did not take photographs of those listings, nor does he recall describing those listings for the Marion Planning Commission.

Marion Planning Commission meetings are open to the public. Billy Houston, who is Caucasian, a neighbor of Mr. King, and not a member of the Marion Planning Commission, attended and made statements at the Marion Planning Commission's April 2, 2019, meeting. He was the only non-member of the Marion Planning Commission to address the Airbnb issue at that meeting. In his affidavit submitted to the Court, Mr. Cain references comments collected from neighbors. Mr. Cain believes that this relates to comments made at the April 2, 2019, Marion Planning Commission meeting, which was open to the public, but he acknowledges that Mr. Houston was the only person at that meeting to comment on the Airbnb issue who was not a member of the Marion Planning Commission. Public comments are not vetted in advance of, or after being made at, Marion Planning Commission meetings, according to Mr. Cain. Mr. Cain does not recall Mr. Houston making any racially or ethnically discriminatory comments.

Mr. Cain also attended the Marion City Council meetings where Airbnb regulation was addressed. At those meetings, Mr. Cain heard no comments that he would regard as racially or ethnically discriminatory.

Mr. Cain acknowledged that Marion residents are predominantly Caucasian and that residents of the River Trace neighborhood are probably even more predominantly Caucasian as compared to the rest of Marion.

Mr. Cain had not drawn up a criminal complaint as of the time of the Planning Commission meeting. Mr. Cain has no involvement in the enforcement of ordinances, as those duties fall to the Marion building inspector and police.

Mr. Cain has not spoken with Judge Woody Wheeless about the Airbnb issue. Judge Woody Wheeless serves as the Crittenden County Judge and the Marion Fire Chief, according to Mr. Cain. Mr. Cain confirmed that Judge Woody Wheeless resides in the River Trace neighborhood, which is where Mr. King's home is located.

### C.    Jerry Kelley's Testimony

Jerry Kelley, Building Inspector and Code Enforcement Officer for Marion, testified (Dkt. No. 14-2, ¶ 1). He has held the position of Building Inspector and Code Enforcement Officer for approximately 15 years. He is responsible for enforcing Marion's Zoning Ordinance, Ordinance No. 124, and any amendments thereto, including Ordinance 585 (*Id.*, ¶ 2). Mr. Kelley receives complaints regarding code enforcement, investigates the complaints, and then takes action if appropriate. Mr. Kelley confirmed that Marion ordinances prohibit parking on the street only from midnight to 6:00 a.m. Mr. Kelley also confirmed that Stacy Trevino, who allegedly authored some of the Facebook posts in evidence, is not an employee of Marion.

Mr. Kelley testified that he received complaints regarding Mr. King's Airbnb. He recalled complaints from the neighbors on either side of Mr. King and the neighbor across the street from Mr. King. Specifically, he received complaints about parking, including complaints and photographs of U-hauls being parked on the side of the road. Mr. Kelley testified that he never

received a complaint from Judge Woody Wheeless about Mr. King, although Mr. Kelley and Judge Woody Wheeless have spoken.

Mr. Kelley went out to investigate these complaints, and he put a door hanger on Mr. King's door. At that time, Mr. Kelley had never met Mr. King and did not know Mr. King's race or ethnicity. A door hanger alerts the home owner to contact Marion about an issue. Mr. Kelley recalls placing the door hanger on Mr. King's door approximately three or four days before the cease-and-desist letter was sent (*Id.*, at 6).

At the time Mr. Kelley sent the cease-and-desist letter, he had never met Mr. King and was unaware of his race or ethnicity (*Id.*, ¶ 8). Mr. Kelley had spoken on the telephone with Mr. King prior to issuing the cease-and-desist letter. Ordinance 124, as originally enacted, was in effect when the cease-and-desist letter was sent; Ordinance 585 had not yet been passed by the Marion City Council.

Mr. King's home is located in an R-1 zone, and the dispute with Mr. King appears to center around the definition of "home occupation." That phrase is defined in Ordinance 124. Home occupations, with certain exceptions, were allowed in R-1 neighborhoods at that time. One of the exceptions listed is "tourist home," which is an undefined phrase in Ordinance 124. Mr. Kelley, who was charged with enforcing Ordinance 124, testified that he believed the phrase meant accepting tourists, much like a motel, whereby people traveling through would stop, stay a day or two, and then move on. Mr. Kelley believed that Mr. King, who resided in a single-family R-1 neighborhood, was converting his property into a multi-family property and thereby in violation. Mr. Kelley also believes that renting out a room by the night is probably not acceptable under the Marion ordinance.

From the date of the cease-and-desist letter to the date of the hearing, Mr. Kelley took no further enforcement action against Mr. King. Mr. Kelley is not responsible for drawing up or serving a criminal summons, and he is unaware whether one was drawn up in this case. Mr. Kelley testified that, although they are similar, he believes that there is a difference between a summons, which directs an appearance in court, and a citation, which is like a ticket.

Mr. Kelley was at the Marion Planning Commission meeting at which Mr. Houston spoke. According to Mr. Kelley, Mr. Houston sent many pictures to his cell phone.[10] Mr. Kelley also testified that, at least once per week, he receives a complaint, usually in the form of a telephone call, from one of Mr. King's neighbors, usually Mr. Houston. These neighbors report that Mr. King is still doing it–presumably operating an Airbnb–and that he still has three people at his house.

On March 7, 2019, Mr. Kelley sent a cease-and-desist letter to Brianna and Terry White, who were also operating an Airbnb out of their residential home in Marion (*Id.*, ¶ 7). At the time, Mr. Kelley was not aware of the ethnicity of either Brianna or Terry White, but he has since learned that they are Caucasian (*Id.*, ¶ 9). Marion never received complaints regarding Terry and Brianna White. Instead, Marion became aware of the operation of the Airbnb and cited them for it. According to Mr. Kelley, Marion discovered the listing on Airbnb, a Marion employee printed a photograph of the house from Airbnb, and then Mr. Kelley drove around comparing front doors in Marion with the picture printed from Airbnb. Since sending that cease-and-desist letter, Mr. Kelley had received no further information that Terry and Brianna White continued to operate an Airbnb. However, prior to the hearing, Mr. Kelley learned from counsel that Terry and Brianna

---

[10] Plaintiff's Exhibit 14 is copies of photographs aired by WREG-TV, the CBS-affiliate in Memphis, Tennessee, that look similar to the photographs that Mr. Houston sent to Mr. Kelley.

White might still be operating an Airbnb in Marion. Neither Marion nor Mr. Kelley has taken any further enforcement action against Terry and Brianna White while Mr. King's lawsuit has been pending. However, Mr. Kelley testified that Marion planned to take further enforcement action against the Whites, pending the outcome of Mr. King's lawsuit.

Mr. Kelley testified about the process he used to determine if an Airbnb was being operated in Marion. Two employees work under Mr. Kelley. One of those employees checks Airbnb from time to time to determine whether any are operating in Marion. Mr. Kelley does not check the site himself; instead he relies on the information Marion employees provide to him.

Mr. Kelley also testified that, while attending Marion Planning Commission and Marion City Council meetings, he has never seen any examples of racial discrimination against Mr. King. Mr. Kelley did recall Sherry Holliman, an African American female member of the Marion City Council, asking Mr. King at a meeting whether he was continuing to rent out his home and whether, if she were to knock on Mr. King's door, Mr. King would answer. Mr. Kelley had not heard that type of question or exchange at a Marion City Council meeting before.

### III. Standard

When determining whether to grant a motion for temporary restraining order or preliminary injunction, this Court considers the same factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest. *See Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (citing *Dataphase Sys. Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors. *See Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations

omitted). The focus is on "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. In deciding whether to grant preliminary injunctive relief, "likelihood of success on the merits is most significant." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012) (quoting *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). The "ordinary preliminary injunction test" applies here, and it "asks only whether a movant has demonstrated a 'fair chance of prevailing' in the ultimate litigation . . . ." *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014) (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 736 (8th Cir. 2008) (en banc)).

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Bierman v. Dayton*, 817 F.3d 1070, 1072 (8th Cir. 2006) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). "Other courts have granted preliminary relief without regard to establishing the status quo, as long as there was a showing of potential irreparable harm, and at other times, as long as the injunction creates a common sense modus vivendi . . . ." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984) (quoting *Unicon Mgmt. Corp. v. Koppers Co.*, 366 F.2d 199, 204 (2d Cir. 1966)).

## IV.     Article III Standing

As a preliminary matter, the Court raises on its own whether Mr. King has standing. Under Article III of the Constitution of the United States, federal courts only have subject-matter jurisdiction over "cases" and "controversies." U.S. Const., art. III, § 2; *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998) ("Article III, § 2, of the Constitution extends the 'judicial Power' of the United States only to 'Cases' and 'Controversies.'"). If there is no case or controversy, then a court does not have subject-matter jurisdiction and must dismiss the action.

To be a case or controversy, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–241 (1937) (citations omitted). Furthermore, the dispute must be "real and substantial" and request "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241 (citations omitted).

To establish Article III standing, a plaintiff must satisfy three requirements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (alterations, citations, and internal quotation marks omitted).

The injury-in-fact requirement helps to ensure that a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). "A 'concrete' injury must be '*de facto*,'" which means that it cannot be abstract but must actually exist. *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 561 (citations omitted).

As relevant here, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citing *O'Shea v. Littleton*, 414 U.S. 488,

494 (1974)).  In making the required showing, however, a plaintiff "need not expose itself to arrest

or prosecution in order to challenge" a statute.  *St. Paul Area Chamber of Commerce v. Gaertner*,

439 F.3d 481, 485 (8th Cir. 2006).  Nor must a plaintiff "await the consummation of threatened

injury to obtain preventive relief."  *Babbitt*, 442 U.S. at 298 (quoting *Pennsylvania v. West

Virginia*, 262 U.S. 553, 593 (1923)).  In particular, "[w]hen a statute is challenged by a party who

is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute]

has caused him injury.'"  *Gaertner*, 439 F.3d at 485 (second alteration in original) (quoting *Minn.

Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 131 (8th Cir. 1997)).

Moreover, a sufficient injury "is usually found if the regulation imposes costly, self-executing

compliance burdens or if it chills protected First Amendment activity."  *Minn. Citizens Concerned

for Life*, 113 F.3d at 132 (citations omitted).

    Here, on February 28, 2019, Mr. King received from Marion a cease-and-desist letter, dated

February 25, 2019, after Ordinance 124 was enacted but before it was amended by Ordinance 585.

Mr. King claims that he was threatened by Marion with a criminal complaint, although there is no

evidence through Mr. Cain or Mr. Kelley's testimony that such a complaint was contemplated or

drawn up.  The cease-and-desist letter that Mr. King received on February 28, 2019, makes clear

that, if the alleged offending practice continues, "appropriate enforcement action will be initiated."

(Dkt. No. 14-2, at 4).  The letter does not specify the type of enforcement action.  The cease-and-

desist letter references Ordinance 124 and not Ordinance 585 because the latter ordinance

amending the former ordinance had not yet been enacted.  Defendants take the position that

Ordinance 585, which was passed by the Marion City Council on June 25, 2019, amends but does

not supplant Ordinance 124.  The text of Ordinance 585 supports this conclusion.  Mr. King

testified that, upon receiving the cease-and-desist letter on February 28, 2019, he stopped operating

as an Airbnb and stopped advertising his home at 285 River Trace Drive on Airbnb. He concedes that he still has roommates, however. Given the record evidence at this time, the Court will credit Mr. King's testimony and determine that Mr. King has standing to proceed with this action.

## V.    Request For Preliminary Injunction

Mr. King brings several claims in his complaint against Marion and Mr. Fogleman. The Court understands these complaints generally to allege: (1) violation of the Fourteenth Amendment to the United States Constitution based on equal protection; (2) violation of the Fourteenth Amendment based on substantive and procedural due process; (3) violation of the First Amendment to the United States Constitution; (4) an unconstitutional Takings claim; and (5) statutory violations of the Civil Rights Act of 1866, the Civil Rights Act of 1871, and the Administrative Procedure Act (Dkt. No. 1, at 6-23).[11] Mr. King seeks from this Court a temporary restraining order and/or preliminary injunction that restrains Marion and Mr. Fogleman from enforcing Ordinance 124 (Dkt. No. 2, ¶ 10).[12]

---

[11] The Court acknowledges that Mr. King refers to the Arkansas Constitution. He does not cite a specific provision of the Arkansas Constitution nor any cases interpreting it. Because neither Mr. King nor defendants analyze these claims, the Court determines that Mr. King has not demonstrated on the record before it that he is likely to prevail on any separate claim under the Arkansas Constitution.

[12] As a part of his request for a temporary restraining order and preliminary injunction, Mr. King also requests that the Court enjoin Marion and Mr. Fogleman from deleting or destroying materials such as emails, phone messaging applications, Facebook posts, documents, audio recorded public meetings, or other relevant material (Dkt. No. 2, ¶ 10). In the Order from August 12, 2019, the Court advised all counsel in this matter to remind their clients of their obligations to institute a litigation hold (Dkt. No. 10, at 2). The Court also emphasized that the meaning of documents as used in reference to the litigation hold extends to all electronic information in whatever form it existed, exists, or may exist (*Id.*). The Court further reminded the parties, under the doctrine of spoliation, of their duty to preserve, including but not limited to a duty not to destroy, evidence when litigation is filed or becomes reasonably anticipated (*Id.*, at 2–3); *see also Burris v. Gulf Underwriters Ins. Co.*, 787 F.3d 875, 879–80 (8th Cir. 2015). The Court again reminds the parties of these obligations.

At the hearing, Mr. King summarized three points.  First, he asserted that he had been discriminated against by defendants.  Second, he maintains that Ordinance 124 is vague based on its undefined terms and that, under Arkansas law, such a vague ordinance cannot be enforced.  Third, he maintains that, even with Ordinance 585 amending it, Ordinance 124 remains too vague to be enforced.  He contends that he has suffered and will continue to suffer irreparable harm in the absence of an injunction.

### A.       Likelihood Of Success On The Merits

The Court will first analyze each claim to determine if Mr. King has established a fair chance of prevailing on the merits of any of his claims.  The Court considers all of Mr. King's claims as applied, not facial, challenges.  *See Minn. Majority v. Mansky*, 708 F.3d 1051, 1059 (8th Cir. 2013).

### 1.       Fourteenth Amendment

The Fourteenth Amendment, in relevant part, provides: "No State shall. . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  Mr. King brings several claims under the Fourteenth Amendment.

### a.       Equal Protection

One of Mr. King's primary claims centers around what he characterizes as unequal treatment based on his race or ethnicity.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids a state to "deny to any person within its jurisdiction the equal protection of the laws."  *Id.*  The Equal Protection Clause requires that the government must generally treat similarly situated persons alike.  *See Creason v. City of Washington,* 435 F.3d 820, 823 (8th Cir. 2006) (citing *City of Cleburne v. Cleburne Living Ctr.,*

*Inc.*, 473 U.S. 432, 439 (1985)).  If the government engages in disparate treatment, the Court must determine the level of scrutiny to apply to the governmental action.  A difference in treatment based on a suspect category such as race or national origin is subject to strict scrutiny and will be sustained only if the classification is "suitably tailored to serve a compelling state interest." *Cleburne Living Ctr.*, 473 U.S. at 440 (citations omitted).  A difference in treatment based on gender also receives heightened scrutiny and will be invalidated unless the classification is "substantially related to a sufficiently important governmental interest."  *Id.* at 441 (citations omitted).  All other classifications are subject to rational-basis review and will be upheld "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993) (citations omitted).

Based upon the record before the Court at this stage of the proceedings, the Court determines that Mr. King is not likely to prevail on this claim.  The evidence at this stage does not support Mr. King's assertion that Marion and Mr. Fogleman enforced Ordinance 124 or Ordinance 585 against him based on his race or ethnicity differently than how defendants enforced Ordinance 124 or Ordinance 585 against others similarly situated but outside the protected class.  *See Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004) ("[T]o state an equal protection claim, appellant must have established that he was treated differently from others similarly situated to him.") (citation and internal quotation marks omitted).  The record evidence indicates that Mr. Kelley issued a cease-and-desist letter to Terry and Brianna White, who are Caucasian, for operating an Airbnb in a neighborhood zoned R-1 in Marion.  The record evidence indicates that neither Mr. King nor Terry and Brianna White have been criminally cited or prosecuted for violating these ordinances.  This evidence does not support Mr. King's equal protection claim.  The Court acknowledges that Mr. King characterizes some comments and references made by Marion

21

employees as based on race or ethnicity.  Even if true, those comments do not change the Court's overall determination on this claim.

Additionally, based on the record before the Court, the Court determines that Mr. King is not likely to prevail on a claim that Ordinance 124, as amended by Ordinance 585, fails rational-basis review.  Ordinance 124 appears rationally related to the legitimate purpose of protecting the community from the negative effects associated with the operation of short-term rentals in single-family residential districts, such as additional traffic, noise and light disturbances, the commercialization of residential neighborhoods, and the loss of tax revenues, as argued by defendants.  As such, Mr. King has not met his burden to negate "every conceivable basis which might support" Ordinance 124.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (quoting *Madden v. Kentucky*, 309 U.S. 83, 88 (1940)).  Therefore, at this stage of the proceedings, Mr. King has not demonstrated that he is likely to prevail on his equal protection claim.

### b.    Arbitrary And Capricious

Mr. King challenges Ordinance 124, as amended by Ordinance 585, as arbitrary and capricious.  "Substantive due process may be violated if state action either shocks the conscience or offends notions of fairness or human dignity."  *Klein v. McGowan*, 198 F.3d 705, 710 (8th Cir. 1999) (citing *Weimer v. Amen*, 870 F.2d 1400, 1405 (8th Cir. 1989)).  Due process claims involving local land-use decisions must demonstrate "that the government action complained of is truly irrational, that is, something more than arbitrary, capricious, or in violation of state law."  *Anderson v. Douglas Cty.*, 4 F.3d 574, 577 (8th Cir. 1993) (alteration, citation, and internal quotation marks omitted).  The action must, therefore, be so egregious or extraordinary as to shock the conscience.

*See County of Sacramento v. Lewis,* 523 U.S. 833, 846–47 (1998); *Burton v. Richmond,* 370 F.3d 723, 729 (8th Cir. 2004).

With respect to zoning, the Supreme Court of Arkansas has noted that zoning is a public matter. *See Mings v. City of Fort Smith*, 701 S.W.2d 705, 708 (Ark. 1986). While the rights and duties of landowners, neighbors, and the general public conferred and required by zoning laws must sometimes be interpreted and protected by the courts, basic land-use planning is a legislative function in which the courts should interfere only when necessary. *See id.* Arkansas law does require municipalities to comply with local and state law when passing zoning ordinances. *See City of Russellville v. Banner Real Estate*, 933 S.W.2d 803, 804 (Ark. 1996). A failure to comply substantially with the procedural requirements of enabling legislation renders a subsequent ordinance invalid. *See Potocki v. City of Fort Smith*, 648 S.W.2d 462, 464 (Ark. 1983).

Based on controlling law and the evidence in the record, Mr. King is not likely to prevail on this claim. Ordinance 124, as amended by Ordinance 585, prohibits certain temporary rentals in R-1 single-family residential districts in Marion. Defendants argue that Mr. King violated Ordinance 124 by engaging in temporary rentals of a bedroom or bedrooms in the main residence, as well as temporary rentals of an accessory residence located on Mr. King's property. Although the evidence may be unclear as to how many neighbors complained, it is undisputed that neighbors complained about Mr. King using Airbnb to rent rooms on a short-term basis. Defendants sent cease-and-desist letters to Mr. King and Terry and Brianna White. When these issues arose, Mr. Cain researched Airbnb ordinances in other jurisdictions. He, as the part-time City Planner for Marion, drafted Ordinance 585 to amend Ordinance 124. At public meetings, the Marion Planning Commission and City Council discussed regulating Airbnb use of homes in Marion. There is insufficient evidence in the record for the Court to conclude that any procedural irregularities led

to Ordinance 585 being enacted or Ordinance 124 being enforced.  Further, the record evidence does not support a conclusion that defendants' alleged conduct was egregious or extraordinary as to shock the conscience.  As a result, the Court determines that Mr. King has not established that he is likely to prevail on the merits of this claim.

### c.     Void For Vagueness

Mr. King also brings a due process claim based on the alleged vagueness of Ordinance 124 and presumably Ordinance 585.  "The void-for-vagueness doctrine is embodied in the due process clauses of the fifth and fourteenth amendments." *D.C. v. City of St. Louis*, 795 F.2d 652, 653 (8th Cir. 1986) (citing *Postscript Enters., Inc. v. Whaley*, 658 F.2d 1249 (8th Cir. 1981)).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  Under the vagueness doctrine, "a law is unconstitutional if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Musser v. Mapes*, 718 F.3d 996, 1000 (8th Cir. 2013) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  A law can also be impermissibly vague "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing *City of Chicago v. Morales*, 527 U.S. 41, 56–67 (1999)).  To overcome a vagueness challenge, a court should find it "clear what the ordinance as a whole prohibits." *Grayned*, 408 U.S. at 110.

In Ordinance 124, Article II, Section 1.B lists the uses permitted in an R-1 single-family zone.  Section B(6) specifically lists "home occupation" as a permitted use.  Home occupation is defined in Article X, Section B of Ordinance 124.  Further, on June 25, 2019, Marion passed Ordinance 585, which revised the definition of home occupation.  Section 2 of Ordinance 585

provides, in relevant part, that "[t]he following uses shall not be deemed a home occupation. Beauty shop, barber shop, nails shop, tea room, restaurant, nursing home, clinic, doctor office, dentist office, child care center, real estate office, bed and breakfast accommodations, room and boarding accommodations, metal shop, cabinet shop, and auto repair shop." Mr. King appears to question "bed and breakfast accommodations" and "room and boarding accommodations" as vague and, therefore, constitutionally deficient.

To determine whether an ordinance is unconstitutionally vague, courts rely "on the common usage of statutory language, judicial explanations of its meaning, and previous applications of the statute to the same or similar conduct." *City of St. Louis*, 795 F.2d at 654 (quoting *Postscript Enters.*, 658 F.2d at 1255). The Court concedes that this argument gives it some pause. Having carefully considered it, however, the Court determines that Mr. King has not demonstrated that these phrases are so vague as to leave individuals guessing as to the meaning of Ordinance 124 or Ordinance 585. Further, the Court is not persuaded that Mr. King is likely to prevail in showing that there is a real risk of discriminatory enforcement and that the ordinances fail to make clear what conduct is prohibited. *See Veneklase v. City of Fargo*, 248 F.3d 738, 747 (8th Cir. 2001) (determining that a city ordinance prohibiting residential picketing was not unconstitutionally vague "[b]ecause there is no real risk of discriminatory enforcement and because the ordinance makes clear what conduct it prohibits"). For these reasons, at this stage of the proceeding and on the record before it, the Court determines that Mr. King has not sufficiently demonstrated that he is likely to prevail on the merits of this claim.

### d. Procedural

To the extent Mr. King asserts a procedural due process claim, he has the burden of demonstrating: (1) that he has a life, liberty, or property interest protected by due process; (2) that

he was deprived of this protected interest; and (3) that Marion did not afford him adequate procedural rights prior to depriving him of this interest. *See Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955, 965–66 (8th Cir. 2015) (citation omitted). At no time does Mr. King allege what process he claims he was due but denied. The Court determines that Mr. King has not demonstrated that he is likely to succeed on the merits of this claim.

### 2. First Amendment

At the hearing, Mr. King did not address directly his First Amendment claim. With respect to Ordinances 124 and 585, even clear enactments may nevertheless be "overbroad" if in their reach they prohibit constitutionally protected conduct. *Grayned*, 408 U.S. at 114. The Court must examine whether the challenged ordinances sweep within their prohibitions what may not be punished under the First Amendment. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973). Although it is common to place the burden upon defendants to justify impingements on First Amendment interests, it is the obligation of Mr. King who desires to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. *See Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n.5 (1984).

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits laws that abridge the freedom of speech." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). Like most rights, however, "the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942); *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 772 (8th Cir. 2019) ("[T]he First Amendment's right of free speech is not unlimited.") (citation and internal quotation mark omitted).

The initial inquiry under the First Amendment is whether Ordinance 124, as amended by Ordinance 585, targets speech or speakers or is better construed as an economic regulation. "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct," and "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011). "But a statute falls within the purview of the First Amendment if it 'imposes a burden based on the content of speech and the identity of the speaker.'" *Missouri Broadcasters Ass'n v. Schmitt*, 946 F.3d 453, 458 (8th Cir. 2020) (quoting *Sorrell*, 564 U.S. at 567); *see also Lucero*, 936 F.3d at 772 ("Courts draw a clear line 'between content-based and content-neutral regulations of speech.'") (quoting *Becerra*, 138 S. Ct. at 2371).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2227 (2015). A content-based regulation "'on its face' draws distinctions based on the message a speaker conveys," *id.* (quoting *Sorrell*, 564 U.S. at 566), or has the purpose of suppressing speech "because of disagreement with the message it conveys," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citing *Cmty. For Creative Non-Violence*, 468 U.S. at 295). Content-based restrictions on speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226.

Here, the Court determines that the conduct prohibited by Ordinance 124, as amended by Ordinance 585—that is, operating a bed and breakfast or a room and boarding accommodation in Marion in an R-1 single-family residential zoning district—likely does not have a significant expressive element as to draw First Amendment protection. On the limited record currently before

the Court, both Ordinance 124 and Ordinance 585 appear content-neutral in that they appear aimed not at the content of activity but at its secondary effects. The record before the Court indicates that Ordinance 585 was adopted to address the negative effects associated with the operation of short-term rentals in single-family residential neighborhoods, including additional traffic, noise and light disturbances, the commercialization of residential districts, and the loss of tax revenues. On the record currently before the Court, it does not appear that a specific speaker or message is targeted for disparate or unfavorable treatment under either ordinance. Importantly, the evidence before the Court also does not establish that the zoning ordinances were motivated by a desire to suppress speech or that they have the effect of targeting expressive activity. To the limited extent the ordinances might be said to affect speech, the impact or burden, at least at this stage, appears minimal and purely incidental.

The Ninth Circuit issued a recent decision involving a First Amendment challenge to a municipal zoning ordinance in *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019). In that case, online platforms for rental accommodations alleged that a city ordinance prohibiting unlicensed short-term housing rentals impermissibly infringed upon their First Amendment rights. *See id.* at 679–80. The Ninth Circuit rejected the challenge, finding that the ordinance did not implicate the platforms' First Amendment rights because the ordinance did not target conduct with a significant expressive element, was not intended to regulate speech, and did not single out those engaged in expressive activity. *See id.* at 684–86. The Ninth Circuit also noted that "the incidental impacts on speech" were "minimal" and limited only to advertisements of unlawful rentals. *Id.* at 686.

A similar decision was reached in *Airbnb, Inc. v. City & Cty. of San Francisco*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016). In that case, providers of online hosting platforms for home-

sharing short-term rentals sought a preliminary injunction barring enforcement of an ordinance that made it a misdemeanor to provide booking services for unregistered rental units. *See id.* at 1069. The Northern District of California held that the providers were not likely to succeed on the merits of their claim that the ordinance was a content-based speech restriction in violation of the First Amendment. *See id.* at 1076; *see also Airbnb, Inc. v. City of Bos.*, 386 F. Supp. 3d 113, 122–23 (D. Mass. 2019), *appeal dismissed*, No. 19-1561, 2019 WL 6522166 (1st Cir. Sept. 3, 2019) (finding that Airbnb was not likely to prevail on the merits of its claim that a city ordinance regulating short-term residential rentals and subjecting booking agents to fines for accepting fees for booking ineligible units violated the First Amendment).

Returning to Mr. King's case, because based on the current record before the Court the ordinances appear directed at specific commercial transactions and appear only incidentally to burden expressive activity or speech, the Court is likely to view the ordinances as restrictions on commercial speech. "The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 562–63 (1980) (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978)). A restraint on commercial speech that is neither misleading nor related to unlawful activity is subject to intermediate scrutiny, and suppression is permitted whenever it "directly advances" a "substantial" governmental interest and is "not more extensive than is necessary to serve the interest." *Id.* at 566. However, the Supreme Court has consistently held that speech proposing an illegal transaction is excluded from First Amendment protection. *See United States v. Williams*, 553 U.S. 285, 297 (2008) (collecting cases); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389 (1973) ("Any First Amendment

interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.").

Mr. King contends that the ordinances are an unconstitutional infringement on free speech. Mr. King maintains that the ordinances burden speech because their effect is to preclude him from listing his Marion residence on Airbnb. As a preliminary matter, the Court notes that defendants have represented that the ordinances do not prohibit all rentals in single-family residential districts in Marion. Based upon the language of the ordinances, other types of rentals may be permissible.

Second, and more importantly, the ordinances do not limit Mr. King's ability to publish advertisements for rentals that may violate the ordinances. Instead, the ordinances prohibit homeowners from, among other things, operating a bed and breakfast or room and boarding accommodation in an R-1 single-family residential district in Marion. Stated differently, the ordinances appear to target business transactions to secure home-sharing rentals in single-family neighborhoods, not conduct with any significant expressive element.

Furthermore, under Ordinance 124, as amended by Ordinance 585, it is unlawful in Marion to operate a bed and breakfast or a room and boarding accommodation in an R-1 single-family residential zoning district. Mr. King is not likely to prevail on a claim that he can seek to set aside on First Amendment grounds an ordinance that he contends would restrict his ability to communicate offers to rent illegal units. *See City & Cty. of San Francisco*, 217 F. Supp. 3d at 1079.

Finally, even if the Court were to apply intermediate scrutiny, Mr. King is not likely to prevail on this claim. Instead, the Court determines on the limited record before it that the ordinances likely would still withstand judicial review. Defendants have articulated what they contend is a substantial governmental interest in prohibiting certain home-sharing rental

arrangements in single-family residential neighborhoods. Defendants also assert that the substantial governmental interest is directly advanced by the ordinances and that the ordinances are not more extensive than is necessary to serve that interest. At this stage, the Court is skeptical that, even under intermediate scrutiny, Mr. King is likely to prevail on this claim.

In conclusion, Mr. King has not demonstrated that he is likely to succeed on the merits of his First Amendment claim.

### 3. Takings

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause is made applicable to the states through the Fourteenth Amendment. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (citing *Chi., B & Q.R. Co. v. City of Chicago*, 166 U.S. 226 (1897)). Here, Mr. King brings such a claim.

The Supreme Court has recognized that the "Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49 (1960). The Court has been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government. *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594 (1962). The inquiry into whether a taking has occurred essentially remains an ad hoc, factual inquiry. *See Glosemeyer v. Mo.-Kan.-Tex. R.R.*, 879 F.2d 316, 324 n.8 (8th Cir. 1989).

To bring a claim under the Takings Clause, a claimant must identify a property interest cognizable under the Fifth Amendment. In *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998), a majority of the Supreme Court held that a claimant must have a specific property interest to be

within the purview of the Takings Clause. "Property interests, of course, are not created by the Constitution." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972). "Because the Constitution protects rather than creates property interests, the existence of a property interest is determined by reference to existing rules or understandings that stem from an independent source such as state law." *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (citation and internal quotation marks omitted).

"[C]ourts have held that no property rights are created in permits and licenses." *Conti v. United States*, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing *United States v. Fuller*, 409 U.S. 488, 493 (1973), and *Alves v. United States*, 133 F.3d 1454, 1457 (Fed. Cir. 1998)). However, property rights typically include the right to sell, assign, or transfer the property. *See United States v. Craft,* 535 U.S. 274, 284 (2002) (stating that the right to alienate property is "a right that is often in the bundle of property rights"); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (same). Also, "[c]ontracts may create rights of property . . . ." *Connolly v. Pen. Benefit Guar. Corp.*, 475 U.S. 211, 223 (1986) (quoting *Norman v. Balt. & O.R. Co.*, 294 U.S. 240, 307 (1935)); *see*, *e.g.*, *Omnia Commercial Co. v. United States*, 261 U.S. 502, 508 (1923) (holding that a contract for the purchase of steel constituted property under the Takings Clause). At this stage of the proceeding, the Court assumes, without deciding, that Mr. King has a sufficient property right to invoke the Takings Clause.

"[N]ot every destruction or injury to property by government action has been held to be a 'taking' in the constitutional sense." *Armstrong*, 364 U.S. at 48. "Diminution of property value alone does not establish a taking." *Outdoor Graphics, Inc. v. City of Burlington*, 103 F.3d 690, 695 (8th Cir. 1996) (citations omitted). "In Justice Holmes' storied but cryptic formulation, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a

taking.'" *Lingle*, 544 U.S. at 537 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). "The rub, of course, has been—and remains—how to discern how far is 'too far.'" *Id.* "At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard,* 444 U.S. 51, 65–66 (1979) (citation omitted).

There are per se takings claims. "Two categories of regulatory takings do not require case-specific inquiry into the public interest advanced in support of the restraint." *Outdoor Graphics*, 103 F.3d at 693–94 (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992)). "First, where government requires an owner to suffer permanent physical invasion of her property— however minor—it must provide just compensation." *Lingle*, 544 U.S. at 538 (citing *Loretto*, 458 U.S. at 419). "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (alteration in original) (quoting *Lucas*, 505 U.S. at 1019). Here, there is no allegation that defendants required Mr. King to suffer a permanent physical invasion of his property. Instead, Mr. King's claim centers around the economically beneficial use of his property.

In *Lucas*, the Supreme Court stated: "Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." 505 U.S. at 1027. However, the Supreme Court has stated that the *Lucas* rule "was limited to 'the extraordinary circumstances when *no* productive or economically beneficial use of land is permitted.'" *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (quoting *Lucas*, 505 U.S. at 1017). "In the *Lucas* context, of course, the complete elimination of a property's value is the determinative

factor." *Lingle*, 544 U.S. at 539 (citing *Lucas*, 505 U.S. at 1017); *see also Lucas*, 505 U.S. at 1019 n.8 (noting that a 95 percent diminution in value does not constitute a per se taking).

"Outside these two relatively narrow categories[,]. . . regulatory takings challenges are governed by the standards set forth in [*Penn Central Transportation v. New York City*, 438 U.S. 104 (1978)]." *Lingle*, 544 U.S. at 538. In *Penn Central*, the Supreme Court stated:

> In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

*Penn Cent.*, 438 U.S. at 124 (citations omitted).

The economic impact inquiry "must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 495 (1987) (quoting *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 295 (1981). "[T]he *Penn Central* inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Lingle*, 544 U.S. at 540. The economic impact inquiry also focuses on the regulation's interference with reasonable investment-backed expectations. *See Keystone*, 480 U.S. at 495. "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). "Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments

to achieve the legislative end." *Connolly*, 475 U.S. at 227 (quoting *FHA v. Darlington, Inc.*, 358 U.S. 84, 91 (1958)).

Having considered the parties' arguments, the authorities cited, and the record evidence, the Court determines that Mr. King has not made a sufficient showing that he is likely to prevail on his takings claim.

### 4.  Federal Statutory Claims

Mr. King also alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2), the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Civil Rights Act of 1871, 42 U.S.C § 1983.  The APA allows judicial review for persons "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," and defines "agency" as "each authority of the Government of the United States," subject to certain exceptions that are not applicable here.  5 U.S.C. §§ 701(b)(1), 702.  By its own terms, "[t]he APA does not grant federal courts jurisdiction to review actions of state or municipal agencies." *Hunter v. Underwood*, 362 F.3d 468, 477 (8th Cir. 2004).  Accordingly, Mr. King is unlikely to prevail on the merits of his APA claim.

Section 1981 provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  The Eighth Circuit has not yet addressed the question of whether § 1981 of the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, creates a private cause of action against state actors.  Based upon the Court's research, to date, nine federal Courts of Appeals have addressed the issue.  Eight have determined that § 1981 does not create a private right of action against state actors. *See Bouknight v. D.C.*, 109 F. Supp. 3d 244, 251 (D.D.C. 2015); *Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 667 (7th Cir. 2014); *McGovern v. City of Philadelphia*, 554 F.3d 114, 120 (3d Cir. 2009); *Arendale*

*v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008); *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006); *Oden v. Oktibbeha County*, 246 F.3d 458, 463 (5th Cir. 2001); *Butts v. Cty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000); *Dennis v. Cty. of Fairfax*, 55 F.3d 151, 156 n.1 (4th Cir. 1995). Only the Ninth Circuit has reached a different conclusion. *See Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1214 (9th Cir. 1996) (concluding that "the amended 42 U.S.C. § 1981 contains an implied cause of action against state actors," thereby overturning the holding in *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 710 (1989), that "42 U.S.C. § 1983 provides the exclusive federal remedy against state actors for the violation of rights under 42 U.S.C. § 1981").

Assuming, arguendo, that an injured party may resort to § 1981 to obtain relief for violations committed by state actors, Mr. King has not shown on the limited record before the Court that he is likely to prevail in arguing that Marion, by enacting and amending zoning ordinances to regulate short-term rentals operating in single-family residential districts, has interfered with his right to make and enforce contracts on racial grounds. Therefore, Mr. King has not demonstrated that he is likely to succeed on the merits of his § 1981 claim.

Finally, "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting 'under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory.'" *Gomez v. Toledo*, 446 U.S. 635, 638 (1980) (quoting 42 U.S.C. § 1983)). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). Because Mr. King has not demonstrated that he is likely to prevail

on any of his other claims, he has also not demonstrated that he is likely to succeed on the merits of his § 1983 claim.

### B.     Irreparable Harm, Balance Of Equities, And Public Interest

The Court concludes that, based upon the present record evidence, Mr. King has not sufficiently demonstrated a threat of irreparable harm.  A threat of irreparable harm exists when a party demonstrates a harm that may not be compensated by money damages in an action at law. *See Kroupa*, 731 F.3d at 820; *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371–72 (8th Cir. 1991).  "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *General Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)).  The Court acknowledges there is some record evidence that, if criminally prosecuted or cited, Mr. King may face professional consequences.  However, this evidence was not developed at the hearing and is not very convincing at this stage.  There is no record evidence that Mr. King has been criminally cited or prosecuted for violating Ordinance 124; however, the Court acknowledges that, if defendants determine that Mr. King is continuing to engage in short-term rental arrangements that run afoul of Ordinance 124, as amended by Ordinance 585, he may be.  Further, in weighing this evidence, the Court considers that Mr. King's primary request for relief centers on a request for money damages as a result of loss of use of his home as an Airbnb.

The Court acknowledges that there are equitable considerations at play on both sides of this dispute.  Mr. King maintains that he inquired about the use of his home as an Airbnb prior to purchasing the home and believed this use was permissible when he purchased the home.  He has an interest in the property generating income.  The Court also acknowledges the record evidence

that Mr. King's neighbors complained about Mr. King's use of his home as an Airbnb and that Marion has the right to regulate use of property through zoning provisions.

Further, the court determines that there are similar considerations with respect to the public interest. Historically, there is support for an individual to determine the use of his or her own property, but there also is support for a city regulating use of property through zoning ordinances. On balance, the Court is not prepared to say on this record that these considerations tip decidedly in favor of Mr. King or defendants.

## VI.      Conclusion

Having considered all of the necessary factors, the Court denies Mr. King's emergency motion for temporary restraining order and motion for emergency temporary restraining order without notifying defendants (Dkt. Nos. 2, 4). The Court also denies as moot Mr. King's motion for waiver of surety bond (Dkt. No. 5).

It is so ordered, this the 3rd day of February 2020.

_____
Kristine G. Baker
United States District Judge